**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

MMB Development Group, Ltd.,

    **Plaintiff**

       **v.**

Westernbank Puerto Rico,

    **Defendant**

**CIVIL NO.** 09-1769 (JAG)

**OPINION AND ORDER**

GARCIA-GREGORY, D.J.

Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint for breach of contract and other related claims. (Docket No. 24). For the reasons set forth, the Court DENIES in part and GRANTS in part Defendant's Motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2005, MMB Development Group, Ltd. ("MMB") and Centro Medico del Turabo, Inc. ("CMT"), a hospital, created a partnership called HIMA Development, S.P. ("HIMA S.P."). The purpose of the partnership was to develop land adjacent to the CMT hospital into a medical office building. As part of the partnership, CMT sold the adjacent land to HIMA S.P. for $350,000. As its contribution to the partnership, MMB contributed $4,506,023 as capital to HIMA S.P. CMT, either directly or through a subsidiary, intended to own a portion of

the building upon completion. HIMA S.P. and its owners, MMB and CMT, anticipated that CMT would buy a portion of the medical office building and the rest would be sold to other businesses. MMB is a developer and did not intend to own any part of the medical office building.

CMT had an ongoing banking relationship with Westernbank[1] and so HIMA S.P. decided to turn to them for financing for the project. Negotiations took place and HIMA S.P. and Westernbank entered an agreement titled "Construction Line of Credit for 'HIMA Plaza I'" (hereinafter "Construction LOC"). HIMA S.P. and Westernbank signed the Construction LOC on April 21, 2005, whereby Westernbank was to provide up to $39,635,000.00 to finance the construction of the medical office building.

As part of the agreement, Westernbank would also provide financing to potential buyers of building space ("Take Out Financing"). Specifically, Section 2.6 of the Construction LOC provided that HIMA S.P. would pay Westernbank $800,000 as a fee to secure Westernbank's "commitment to grant permanent loans to prospective purchasers of offices of the project . . ." (See Docket 24-2). HIMA S.P. paid Westernbank $800,000 in accordance with Section 2.6. This provision ensured MMB that it could exit

---

[1] On Friday, April 30, 2010, Westernbank Puerto Rico was closed by the Office of the Commissioner of Financial Institutions of Puerto Rico. On that same day Banco Popular de Puerto Rico purchased a majority of the remaining assets and assumed all of the deposits of Westernbank Puerto Rico. Banco Popular is the successor to Westerbank and from now on shall be the named party in this action.

the project upon completion and it was a material condition for MMB, owner of HIMA S.P., to allow HIMA S.P. to enter into the construction financing arrangement with Westernbank. Also, Westernbank, MMB, CMT, and HIMA S.P. understood and anticipated prior to and at the time of execution of the Construction LOC that CMT, or one of its wholly owned subsidiaries, would be one of the parties to take advantage of the Take Out Financing.

On November 1, 2006, in anticipation of the completion of the medical office building, MMB entered into a transaction with HIMA-San Pablo Properties, Inc. ("HIMA San Pablo"), a subsidiary of CMT, to sell HIMA San Pablo MMB's interest in HIMA S.P. The purchase and sale agreement provided that MMB would sell its partnership interests in HIMA S.P. to HIMA San Pablo in return for two promissory notes and a security agreement securing the obligations of the promissory notes. One of the promissory notes obligated HIMA San Pablo to pay MMB $10,643,053.00 plus interest. The security agreement gave MMB a security interest in the partnership interests in HIMA S.P. that HIMA San Pablo acquired from MMB. MMB perfected its security by retaining possession of partnership certificates of HIMA S.P. HIMA San Pablo pledged not to transfer any assets out of HIMA S.P. until it paid the Promissory Note in full.

From July 2007 through October 2007, MMB, CMT and Westernbank had regular meetings and worked together to finalize

and close Westernbank's Take Out Financing to either CMT or its subsidiary, HIMA San Pablo, so that HIMA San Pablo could pay the monies due under its Promissory Note to MMB. Westernbank knew during this time that HIMA San Pablo sought the Take Out Financing from Westernbank in order to pay monies due under the Promissory Note owed by HIMA San Pablo to MMB. During this time, employees of Westernbank regularly corresponded with MMB employees through telephonic and other means while the MMB employees were located in Houston, Texas. MMB and Westernbank discussed the status of construction and the status of the loans that Westernbank would make to HIMA San Pablo to repay its debt to MMB. Westernbank gave MMB regular assurances that everything was in order and that the process was moving forward so that MMB would soon receive the funds owed to it under the Promissory Note.

In September 2007, Westernbank employee Nivia Castillo informed CMT's Chief Executive Officer, Joaquin Rodriguez, that Westernbank required additional monies to extend the closing date of the loans to CMT under the Take Out Financing provision of the Construction LOC. Westernbank asserted the Take Out Financing provision in the Construction LOC would soon expire or had expired. Westernbank represented to CMT that with the extension in place Westernbank would close the loans to HIMA San Pablo to enable it to pay its obligations to MMB. Rodriguez

relayed these representations by phone to officers of MMB in Houston, Texas. In response, MMB agreed to pay Westernbank the extension fee of $100,000 to extend the closing date for the Take Out Financing to CMT. MMB officer Paul Berry confirmed these terms by email sent from Texas to Nivia Castillo of Westernbank on September 26, 2007. An employee of Westernbank, Rosemari Rodriguez, called Paul Berry to give him instructions on how to wire $100,000 to Westernbank. Nivia Castillo also e-mailed Paul Berry notifying him that Ms. Rodriguez tried to reach him in order to provide him with wire instructions. Once Paul Berry spoke to Ms. Rodriguez over the phone, MMB wired $100,000 to Westernbank.

At all relevant times herein, Westernbank knew that HIMA San Pablo owed MMB the $10,643,053 due under the Promissory Note and that MMB, CMT, and HIMA San Pablo were relying upon Westernbank to fund the loans to HIMA San Pablo to enable it to pay its obligations to MMB under the Promissory Note. After payment of the $100,000, yet more communications and exchanges regarding the loans took place, but the loans continued to elude CMT and HIMA San Pablo. Furthermore, MMB was not made aware that Westernbank was experiencing significant financial problems, was under investigation by regulators, and that its lending capabilities were already compromised because of a loan-to-one borrower restriction imposed by Puerto Rico banking law. Despite

MMB's efforts, Westernbank continued to delay closing the loans throughout the fall of 2007.

Representatives of HIMA San Pablo, CMT, MMB, and Westernbank met on December 5, 2007 at Westernbank's world headquarters in San Juan, Puerto Rico to discuss the status of Westernbank's long term loans to HIMA San Pablo. Westernbank officers Mario Ramirez, Juan Carlos Pavia, and William Vidal attended the meeting. At the meeting, Joaquin Rodriguez, chief executive officer of CMT and HIMA San Pablo, asked MMB representative Paul Berry to allow the transfer of all of HIMA S.P.'s assets to another subsidiary of CMT, CMT Properties, Inc. ("CMT Properties") as part of a corporate restructuring of CMT. If the transfer took place, all of HIMA S.P.'s ownership interest in the medical office building would be transferred to CMT Properties. Berry, on behalf of MMB, told Rodriguez that MMB would agree to relinquish its rights under the security agreement and allow HIMA S.P. to transfer all of its assets to CMT Properties only on the condition that MMB received prompt payment of the amounts due under the Promissory Note. Rodriguez also requested that MMB agree to restructure the payments that HIMA San Pablo owed to MMB under the Promissory Note such that MMB would only receive $10.1 million immediately from the proceeds of the loan from Westernbank, with the remaining $543,053 to be paid in the future. Berry, on behalf of MMB,

stated that MMB could also agree to restructure the debt on the condition that MMB in fact receive payment of the $10.1 million immediately. Thus MMB's approval of both of CMT's requests was contingent on Westernbank providing the Take Out Financing loans immediately so that MMB could receive the $10.1 million partial payment.

Upon learning of CMT's request and MMB's conditions, Mario Ramirez, an officer of Westernbank, specifically represented to Berry, Rodriquez, and all others present that (1) Westernbank's board of directors and appropriate loan committees had already approved the loan to CMT Properties with the understanding that CMT Properties would use $10.1 million of the proceeds to pay MMB the newly agreed amount due under the Promissory Note, (2) Westernbank would provide the requested take out loan to CMT Properties and wire the $10.1 million in proceeds directly to MMB, (3) the loan to CMT Properties could be funded as soon as CMT Properties and Westernbank completed new paperwork for the loan, and (4) Westernbank could process the new paperwork and fund the loan in approximately one or two weeks.

Whether the borrower under the new long term loan was HIMA San Pablo, as originally anticipated, or CMT Properties, as was discussed at the December 5 2007 meeting, Westernbank, CMT, and MMB all understood that $10.1 million of the proceeds of the loan were to be transferred directly to MMB to repay a portion

of HIMA San Pablo's obligations under the Promissory Note. After Westernbank's representations regarding the loans, MMB thus consented to (1) the transfer of all of HIMA S.P.'s assets from HIMA S.P. to CMT Properties and to (2) the restructuring of HIMA San Pablo's payments to MMB under the Promissory Note so that HIMA San Pablo would pay MMB $10.1 million of the amount owed on the Promissory Note immediately, and defer the remainder to a later time.

HIMA S.P.'s subsequent transfer of assets to CMT Properties included all of HIMA S.P.'s ownership rights in the medical office building. As a result of this transfer, HIMA S.P. no longer had any assets and MMB's security agreement with HIMA San Pablo was now essentially worthless. Westernbank presumably benefited from this transfer because it retained a general security interest in the assets of CMT pursuant to a line of credit that Westernbank had extended to CMT which had an outstanding balance of hundreds of millions of dollars; Westernbank now had additional security for its other loans to CMT.

In the weeks following the December 5, 2007 meeting, MMB regularly emailed and telephoned Westernbank for information on the status of the loan. Westernbank however, never loaned CMT or its subsidiaries the monies it promised on December 5, 2007, nor has it ever transferred any funds to MMB.

By the time the December 5, 2007 meeting took place, bank regulators were scrutinizing Westernbank's operations and pressuring it to reduce its outstanding loans. Furthermore by the time Westernbank accepted MMB's $100,000 payment for the extension of the Take Out Financing commitment, it had enough regulatory and financial troubles that its ability to honor its loan commitments and representations to MMB, CMT, and/or HIMA San Pablo was seriously compromised. Westernbank knew or should have known of these issues, yet MMB was never made aware of them.

Westernbank's delicate condition was finally and completely revealed in a February 2008 press release where it admitted it had suffered a massive multimillion dollar default by another borrower and was under significant regulatory oversight. Westernbank also admitted it was conducting internal restructuring and attempting to greatly reduce certain types of loans.

Sometime between February and March of 2009 Westernbank filed a revised form 10-K that restated the 2007 results and operations of W Holding Company, Inc., Westernbank's parent company. In the 10-K report, the company admitted to being in violation of the loan to one borrower restriction regarding a borrower. Westernbank also admitted being fined $50,000 for failure to correct this violation.

By March of 2009, it was obvious that Westernbank would not be honoring its promise to loan. Shortly thereafter, Plaintiff brought his claims before the Court.

## STANDARD OF REVIEW

### Motion to Dismiss Standard of Review

In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court held that to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95-96 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 599). The Court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiff's favor. See Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990). While Twombly does not require of plaintiffs a heightened fact pleading of specifics, it does require enough facts to have "nudged their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Accordingly, in order to avoid dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." Id. at 555.

In Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937 (2009), the Supreme Court upheld Twombly and clarified that two

underlying principles must guide this Court's assessment of the adequacy of a plaintiff's pleadings when evaluating whether a complaint can survive a Rule 12(b)(6) motion. See Iqbal, 129 S.Ct. at 1949-50.

The First Circuit has recently relied on these two principles as outlined by the Supreme Court. See Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009). "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S.Ct. at 1950 (citing Twombly, 550 U.S. at 556). Thus, any nonconclusory factual allegations in the complaint, accepted as true, must be sufficient to give the claim facial plausibility. Iqbal, 129 S.Ct. At 1950. Determining the existence of plausibility is a "context-specific task" which "requires the court to draw on its judicial experience and common sense." Id. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)). Furthermore,

such inferences must be at least as plausible as any "obvious alternative explanation." Id. at 1950-51 (citing Twombly, 550 U.S. at 567).

**DISCUSSION**

Choice of Law

The *Erie*[2] mandate requires Federal Courts sitting in diversity to apply the choice of law rules of the state wherein the Court sits. Klaxon v. Stentor, 313 U.S. 487 (1941). However, when a case is transferred, the transferee Court must apply the law of the jurisdiction wherein the action was originally filed, including choice of law rules. Van dusen v. Barrack, 376 U.S 612 (1964). This action was originally filed in Texas. It is Texan choice of law rules that must guide our initial inquiry.

In tort and contract cases Texas choice of law rules require courts to apply the law of the jurisdiction with the most significant relationship to the substantive issue in dispute. Duncan v. Cessna Aircraft Co., 665 S.W.2d 414 (1984). It is beyond contention that Puerto Rico is the jurisdiction bearing the most significant relationship to the claims before this Court. All claims arise out of a contract perfected in Puerto Rico, between business entities chartered or organized under Puerto Rico law, and creating obligations to be performed wholly on Puerto Rico soil. The only significant connection of

---

[2] Erie R.R. v. Tompkins, 304 U.S. 64 (1938)(In diversity cases federal courts are to apply state substantive law and federal procedural law).

this case with the state of Texas is that MMB, the Plaintiff in this lawsuit, is a partnership organized under Texas law. Though not to be taken lightly, this factor alone is far from heavy enough to outweigh all other factors, which overwhelmingly point South. Hence, by way of Texas choice of law rules, it is the law of Puerto Rico that must apply to this case.

Waiver of Defenses: Rule 12(g)(2) and Rule 12(h)

Pursuant to the consolidation requirement of Rule 12(g) of the Federal Rules of Civil Procedure, Plaintiff argues that Defendant cannot now file a motion to dismiss under Rule 12(b)(6) for failure to state a claim. Having already filed a motion to dismiss on grounds other than failure to state a claim,[3] Plaintiff avers that Defendant waived his Rule12(b)(6) defense by not including it in his initial motion.

Except as provided in Rule 12(h)(2), Rule 12(g)(2) indeed requires a movant under Rule 12 to consolidate defenses within a single motion:

> (2) Limitation on Further Motions. Except as provided
> in Rule 12(h)(2) or (3), a party that makes a motion
> under this rule must not make another motion under
> this rule raising a defense or objection that was

---

[3] Defendant filed its first Motion to Dismiss before this case was transferred to this Court, while it was before the Hon. Sim Lake in U.S. District Court for the Southern District of Texas (See Docket No. 11).

available to the party but omitted from its earlier
motion.

Fed. R. Crim. P. 12(g)(2)

Rule 12(h)(2), an accompanying provision to be read in
tandem with Rule 12(g)(2) provides:

(2) When to Raise Others. Failure to state a claim
upon which relief can be granted, to join a person
required by Rule 19(b), or to state a legal defense to
a claim may be raised:

(A) in any pleading allowed or ordered under Rule
7(a);

(B) by a motion under Rule 12(c); or

(C) at trial.

Fed. R. Crim. P. 12(h)(2)

A simple reading of the rules disposes of Plaintiff's
argument. A defense under Rule 12(b)(6) for failure to state a
claim is not waived by failure to meet the consolidation
requirement of Rule 12(g). A defense under Rule 12(b)(6) is
specifically preserved by Rule 12(h)(2)and may be raised at any
time before the end of trial, regardless of whether a Rule 12
motion on other grounds was filed at the pleading stage. This is
not only the most reasonable interpretation of the rules, it is

also the law in this circuit. <u>Silva v. Encyclopedia Britannica Inc.</u>, 239 F.3d 385, 388 (1st. Circ. 2001)(Holding that Rule 12(h)(2) is an exception to the consolidation requirement of Rule 12(g) and thus may be raised at any time before trial).

Consequently, Defendant's Motion to Dismiss for Failure to state a claim is properly before the Court.[4]

<u>Contracts and the Puerto Rico Commerce Code</u>

Some of the questions of law before this Court today have not yet been addressed by the Supreme Court of Puerto Rico. We therefore follow the mandate in <u>CIR v. Bosch</u>, 387 U.S. 465 (1967), and make every attempt to sit as a Puerto Rico court. This is a diversity case, and as such, the law of Puerto Rico must be applied. Accordingly, federal court decisions will be used only for their persuasive value and because we believe they represent the approach Puerto Rico courts would take on the pending issues.

1. Applicability of the Puerto Rico Commerce Code

Plaintiff argues that the contract giving rise to this dispute is an ordinary contract governed by the Puerto Rico Civil Code;

---

[4] Plaintiff also alleges that Defendant should not be able to bring forth a Motion to Dismiss under Rule 12(b)(6) since in a prior Motion to Dismiss (Docket No. 11) Defendant argued for dismissal under Rule 9(b) for failure to plead fraud with specificity and particularity. Plaintiff essentially argues that dismissal under Rule 9(b) is equal to dismissal for failure to state a claim under Rule 12(b)(6); since Defendant already made this argument, he is precluded from raising it again now. The Court is not persuaded by Plaintiff's argument. In any case, Defendant's argument under Rule 9(b) was not addressed while this action was pending in Texas; that Motion to Dismiss was disposed of on other grounds when this case was trasnferred to this Court. (See Docket No. 41).

it is not, as Defendant contends, a commercial contract governed by the Puerto Rico Commerce Code (hereinafter "Commerce Code").

The Code applies to commercial transactions. 10 L.P.R.A. § 1002. Whether a transaction is commercial in nature is a question to be determined on a case by case basis. Pescadería Rosas, Inc. v. Lozada, 116 D.P.R. 474 (1985). Regarding the case at bar, Article 229 of the Commerce Code states that a loan agreement shall be considered commercial if (1) one of the parties is a merchant and, (2) the articles loaned are destined for commercial transactions. 10 L.P.R.A. § 1651. Both conditions in Article 229 must be met for the Commerce Code to apply. Rosas, Inc., 116 D.P.R. at 477. Westernbank is a commercial bank chartered under the laws of Puerto Rico with the purpose of engaging in the business of banking and finance. It is thus a merchant for purposes of the Commerce Code. 10 L.P.R.A. § 1001. Furthermore, this Court has held that Banks are merchants for purposes of the Commerce Code. Wilshire Credit Corp. v. G & C Plaza Inc., 62 F. Supp. 2d 396 (Distr. P.R. 1999); Garita Hotel Lt. Partnership v. Ponce Federal Bank, F.S.B. 954 F. Supp 438 (Distr. P.R. 1996). This Court has also held that real estate development is a commercial activity. FDIC v. Barrera, 595 F. Supp 894, 899 (Distr. P.R. 1984).

Considering that the claims in this action arise out of a loan agreement where, both parties are merchants, and the proceeds of

the loan are destined for commercial purposes, it is a commercial loan agreement that is before this Court today. 10 L.P.R.A § 1651. The law that will determine the outcome of this case is the Commerce Code. 10 L.P.R.A. § 1002.

2. 10 L.P.R.A § 1302

Defendant argues in its Motion to Dismiss that Plaintiff's claims are barred by the Puerto Rico statute of frauds. The dispute is centered upon an oral agreement, (or an oral modification to the original loan agreement) whereby Plaintiff paid Defendant $100,000, for the latter to extend the closing date on the proposed loans to HIMA S.P. In the event such an exchange took place (which Plaintiff does not concede) this oral agreement was not reduced to writing. Consequently, according to Defendant, Plaintiff cannot bring forth a claim for breach of contract without a written rendition of the agreement, as required by 10 L.P.R.A. § 1302.

> The Statute of Frauds was designed to prevent the enforcement of unfounded fraudulent claims by requiring written evidence. Or, as it is sometimes expressed, the Statute was enacted to prevent fraud by requiring certain enumerated contracts to be evidenced in writing.

9 Richard A. Lord, <u>Williston on Contracts</u> § 21:1 (4th ed. 2010)

The statute of frauds is a form requirement. At one time a nearly universal figure in common law jurisdictions, the statute of frauds requires of litigants asserting the existence of a contract, that they proffer a written rendition of the agreement to the Court in order to bring claims arising therefrom. No writing equals no contract, with few exceptions. There is something of a statue of frauds in Puerto Rico, that sets a form requirement for certain contracts, which if not met, renders the agreement unenforceable in court, 31 L.P.R.A. § 3453. Generally, contracts for the conveyance of real property, wills, and powers of attorney among others, must be drafted in written form by a notary in order to be enforceable. Id.[5]

Article 82 of the Commerce Code provides:

> Commercial contracts shall be valid and shall cause obligations and causes of action whatever may be the form and language in which they are executed, the class to which they belong, and the amount of the contract, provided their existence is shown by any of the means provided by civil law. However, the testimony of witnesses shall not in itself be

---

[5] ...
Notwithstanding the provisions of the preceding paragraph, commercial contracts made by means of correspondence and all those in which the formality of the authentic document may cause prejudicial delay to the nature and rapidity of mercantile traffic, shall be valid.
31 L.P.R.A. § 3453

sufficient to prove the existence of a contract the
amount of which exceeds three hundred dollars, unless
such testimony concurs with other evidence.

10 L.P.R.A. § 1302


Article 82 is not a statute of frauds.  It is a minimal
standard of proof required of a litigant who claims the
existence of a contract. According to Article 82, a party who
asserts the existence of a contract need not present a writing
to bring forth his claim. The first sentence of Article 82
explicitly rejects imposing a form requirement as a condition
for enforcement. If the second sentence of Article 82 were read
to require written evidence for the enforcement of commercial
agreements, the first sentence of Article 82 would be rendered
inoperative. This Court presumes the lawmaker wise enough to use
ink sparingly. For a Court to require as necessary more than
oral testimony in order to enforce a commercial contract is far
from saying that only a written rendition will suffice.

In its complaint, Plaintiff has indeed alluded to the
existence of non-testimonial evidence which Plaintiff contends
will prove that the contract it seeks to enforce is real. It
would be unwise and unjust for this Court to silence Plaintiff
for not presenting documentary evidence that, at this stage of
the proceedings, it is not under any duty to present. Whether or

not Plaintiff lacks enough documentary or other evidence to defeat Defendant's presumable argument that there never was an agreement, is a question better suited for the summary judgment stage. As of today, Plaintiff's allegations for breach of contract meet the pleading standard under <u>Twombley</u> and <u>Iqbal</u>. The complaint's repeated reference to documents and conversations memorialized in electronic exchanges may be sufficient to meet the threshold required by Article 82.

<u>Breach of Contract</u>

Plaintiff argues that Defendant breached their agreement to extend the closing date on the loans to HIMA S.P. According to Plaintiff, though MMB kept its part of the bargain by paying Westernbank $100,000 to extend the closing date, the promised loans to HIMA S.P. never materialized. MMB was left with $100,000 less and HIMA S.P. without a loan.

Civil law and the Puerto Rico Civil Code govern the formation of contracts in Puerto Rico.[6] The elements required for contract formation are: (1) consent of the contracting parties; (2) the object of the obligation and; (3) the cause of the obligation. 31 L.P.R.A. § 3391. Generally, consent is evidenced through offer and acceptance. 31 L.P.R.A. § 3401. According to the complaint, Westernbank offered to extend the closing date

_____

[6] Although the Commerce Code applies to the agreement, the Civil Code governs on questions of contract formation. <u>Puerto Rico Bedding Mfg. Corp. v. Herger</u>, 91 D.P.R. 519, 523 (1964).

for the loans in exchange for additional monies, albeit $100,000. MMB accepted the offer and in exchange for Westerbank's promise to extend the closing date, paid Westernbank $100,000. MMB and Westernbank thus formed a bilateral contract where the object for Westernbank was the $100,000, and for MMB the promise to extend the closing date on the loans and to provide the loans in accordance with the contract. In bilateral obligations the cause is, in essence, indistinct from the object; for MMB it was Westernbank's promise to extend the closing date, and for Westernbank it was MMB's promise to deliver payment, which it did.

All the elements of contract formation are present. According to the facts alleged by Plaintiff in the complaint, Defendant Westernbank entered an obligation which it did not fulfill; it never provided HIMA SP with the agreed upon loans. Nothing more is needed for the Plaintiff to overcome a Motion to Dismiss.

The Motion to Dismiss as to Plaintiff's claim for breach of contract must be denied.

Fraud

Plaintiff next alleges that Defendant committed fraud when it induced Plaintiff to enter an agreement for Defendant to extend the closing date on the take out financing loans to HIMA S.P. in exchange for $100,000. In essence, Plaintiff avers that

Defendant Westernbank deceived Plaintiff when it agreed to the extension and accepted the $100,000 payment. According to Plaintiff, Westernbank knew all along that it would be unable to provide the loans given the fact that it was under regulatory scrutiny and pressure to reduce its loan portfolio as well as in violation of Puerto Rico banking law. Notwithstanding Westerbank's knowledge of its own precarious situation, Plaintiff argues that throughout the Fall of 2007, before, during, and for a few months after receipt of the $100,000 payment in September of 2007, Westernbank continued to give MMB false assurance that it would deliver on its promise to provide the loans to HIMA S.P.

Plaintiff's claim is essentially one of deceit under Article 1221 of the Puerto Rico Civil Code:

> There is deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made.

31 LPRA § 3408

There can be no deceit without intent. What is behind "words or insidious machinations" is an intention to deceive whereby one party knowingly and intentionally miss-represents

the circumstances surrounding the contract-to-be in order to persuade the other to enter an obligation.

In Puerto Rico, in order to establish a claim under Article 1221, the party alleging deceit must show that the other party acted intentionally or in bad faith. <u>Canales v. Pan American</u>, 112 D.P.R. 329, 339 (1982). Even though at this point, Plaintiff is not under a legal duty to prove his claim of deceit, it is the opinion of this Court that Plaintiff has not met the pleading standard required under <u>Iqbal</u> and <u>Twombley</u>. The mere fact that Westernbank was under regulatory scrutiny, which is the gist of Plaintiff's claim of fraud, is far from enough for one to infer that Westernbank intended to obtain $100,000 from MMB knowing it would never give anything in return. The Court may have before it enough facts to infer that there was negligence on the part of Defendant in representing to Plaintiff that it would deliver on the loans. The Court however, has not nearly enough facts to infer that it did so with the specific intent to deceive Plaintiff.

Plaintiff's claim of fraud must be dismissed.

<u>Negligent Misrepresentation</u>

Plaintiff next claims that Defendant failed to exercise due care in the exchanges leading up to formation of the agreement to extend the closing date on the promised loans to HIMA S.P. Plaintiff avers that Defendant was negligent in assuring

Defendant that with the extension agreement in place, the loans would be well underway, and in failing to inform MMB of important, material facts regarding Westernbank's true ability to provide financing. Defendant's negligent representations and omissions caused MMB to transfer $100,000 to Westernbank and to allow HIMA S.P. to transfer its assets to CMT Properties, thereby rendering MMB's security interest in HIMA S.P. worthless and depriving MMB of its security for its Promissory Note against HIMA San Pablo.

If Plaintiff decides to recover on a theory of tort, it has met the pleading standard for a cause of action under Article 1802 of the Puerto Rico Civil Code. 31 L.P.R.A. § 5141. Plaintiff has pled to the satisfaction of this Court that there may have been negligent conduct on the part of Westernbank, that Plaintiff suffered damages, and that Defendant's negligent conduct was the cause of Plaintiff's damages. Defendant's alleged negligent acts may constitute breach of contract as well as tortious conduct.

The Motion to Dismiss as to Plaintiff's claim of negligent misrepresentation under Article 1802 of the Puerto Rico Civil Code must be denied.

Promissory Estoppel

Plaintiff's next claim is one of estoppel. Plaintiff alleges that it reasonably relied on Westernbank's promise to

fund loans to HIMA San Pablo, for the purpose of remitting such proceeds to MMB. Upon this reliance, and in its detriment, MMB paid $100,000 to Westernbank and effectively surrendered its security interest in HIMA SP by allowing it to transfer its assets to CMT.

In Puerto Rico, a Court will resort to equity only if no statute can be found to apply to a given controversy. 31 L.P.R.A. § 7. The civil law doctrine that no party is allowed to go against its own acts finds its counterpart in the common law doctrine of estoppel. The elements for a cause of action under this doctrine are:

> (a)A certain behavior of a subject, (b) that he has given life to a situation contrary to reality, that is, apparent and, through such appearances, may influence the behavior of others and (c) that it be the basis of the trust of another party which has acted in good faith and that, for that reason, has acted in a manner which would cause him prejudice if his trust was defrauded.

General Electric v. Concrete Builders, 104 D.P.R. 871, 878 (1976)(direct cite from 4 PR Offic. Trans. 1221 (PR 1976))

Plaintiff has met the standard required to carry his claim of estoppel beyond the pleading stage. Plaintiff alleges that

Defendant represented that it would extend the closing period on the loans and eventually deliver on the promised loans to CMT; that these acts and declarations of Defendant painted to Plaintiff an inaccurate portrait that Westernbank was willing and able to deliver on the loans; and that acting in good faith and in reliance on Defendant's acts and declarations, Plaintiff paid $100,000 to Westernbank and gave up its security interest in HIMA S.P.

The Motion to Dismiss as to Plaintiff's claim of estoppel must be denied.

Tortious Interference With Contractual Relations

Plaintiff avers that Westernbank tortiously interfered with MMB's contract with HIMA San Pablo for repayment of HIMA SAN Pablo's debt to MMB. Plaintiff alleges that Westernbank was aware that MMB held a promissory note against HIMA San Pablo that was to be satisfied through the loans that Westernbank was supposed to provide to HIMA San Pablo. It was Westernbank's act (or omission) of not providing the loans to HIMA San Pablo that caused HIMA San Pablo to default on its obligation to MMB.

Under Puerto Rico law, a cause of action for tortious interference with contractual relations exists within Article 1802 of the Civil Code. 31 L.P.R.A. § 5141. In order to establish a claim of tortious interference with contractual relations, a party must show (1) there exists a contract with

which a tortfeasor interferes; (2) that the tortfeasor acted intentionally, with knowledge of the contract; (3) that Plaintiff suffered damages as a result of the breach and; (4) that Plaintiff's damages were caused by the tortfeasor's acts. Dolphin v. Ryder, 127 D.P.R. 869, 879 (1991), 1991 WL 735928 (P.R.); Gen. Office Prods. V. A.M. Capen's, 115 D.P.R. 553, 558-559 (1984), 15 P.R. Offic. Trans. 727 (P.R. 1984).

Plaintiff's claim for tortious interference with contractual relations fails. Plaintiff has made several assertions that all the while Westernbank was aware of MMB's contractual relations with CMT's subsidiaries. Even if we take these assertions to be true, they do not suffice to show that Westernbank acted intentionally in order to have HIMA San Pablo default on its obligations to MMB. This claim does not meet the applicable pleading standard.

Defendant's Motion to Dismiss as to Plaintiff's claim for tortious interference with contractual relations must be granted.

## CONCLUSION

For the reasons stated above, the Court hereby **GRANTS** in part and **DENIES** part Defendant's Motion to Dismiss. Plaintiff's claims of Fraud and Tortious Interference are dismissed. Partial judgment shall be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 2nd day of December, 2010.


<u>S/Jay A. Garcia-Gregory</u>
JAY A. GARCIA-GREGORY
United States District Judge